UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                          CRIM. No.  97-0659 BB

SAMUEL EDMUNDO ASSMAR-NUNEZ,

    Defendant.

### MEMORANDUM OPINION

THIS MATTER comes before the Court for consideration of Defendant's December 23, 1997 motion to suppress (Doc. 30).  The Court has reviewed the parties' submissions and the relevant law and, for the reasons set forth below, determines that Defendant's motion should be GRANTED.

**Facts**

Based on the testimony presented at the hearing on Defendant's motion, the Court finds the following facts relevant to this decision.  This case involves two separate roving border patrol stops of the same individual, driving the same vehicle, on the same highway.  The stops occurred approximately three months apart (the first in July 1997, the second in early October) on Highway 180 in southern New Mexico.  According to the testimony presented at the hearing, Highway 180 is a route commonly used by people smuggling illegal aliens or contraband, because it allows a driver to circumvent fixed checkpoints that are located on other highways such as Interstate 25. See also U.S. v. Barron-Cabrera, 119 F.3d 1454, 1462 (10th Cir. 1997) (noting that Highway 180 is a known smuggling corridor that bypasses fixed checkpoints in the area).

The first stop of Defendant's vehicle occurred at approximately 8:30 in the morning. The border patrol agent who stopped the vehicle, Agent Akins, testified that Defendant was driving a pick-up truck with a half-cab sleeper compartment on it that covered only a portion of the bed of the truck. Underneath the sleeper shell was a propane tank that looked odd to Akins because it was located under the sleeper cab and it appeared to possibly protrude up into the sleeper cab. Akins and his partner began to follow the pick-up and noticed that the truck had an Illinois license plate. Although Akins' suspicion that Defendant might be doing something illegal "wasn't real strong," he decided to stop Defendant's truck to investigate.

After Defendant was stopped, Akins and his partner examined the propane tank and determined that it did indeed extend slightly into the sleeper shell. The floor of the shell had been cut out to accommodate the tank. The shell also appeared to interfere with the operation of the tank's valves, so that it might be necessary to remove the shell to fill the tank with propane. However, Akins confirmed that the propane tank actually did contain propane, and was hooked up to the truck's engine in a proper manner so as to allow the truck to operate on propane or gasoline. Although no evidence was presented on this point, the assistant United States Attorney representing the government did acknowledge at the hearing that using a propane tank system to operate a vehicle is fairly common in southern New Mexico.

During this first stop, Akins inquired into Defendant's destination, which was Chicago, Illinois, Defendant's residence. Defendant stated that he was coming from Palomas, Mexico. Akins thought this odd as well, since Highway 180 is a circuitous route northward, and he asked Defendant about that. Defendant stated that he had missed his turn in Deming and gotten on Highway 180 by mistake. Akins also asked Defendant about his nationality and he testified

Defendant had a hard time remembering the word "naturalized" regarding his citizenship. Akins decided to allow Defendant to proceed, since it would take at least two hours for a drug-sniffing dog to arrive at the scene of the stop and he recognized he did not have a legal basis to detain Defendant.

Approximately three months later, Akins was again patrolling Highway 180 when he saw a pick-up that looked similar to the one he had stopped previously. Akins was not positive it was the same truck, but suspected it was because he could see Illinois license tags and the sleeper cab. Akins pulled up alongside the pick-up. There was a heavy rubber flap hanging from the back of the sleeper compartment and obscuring any view of the propane tank under the sleeper shell. In addition, a sleeping bag was spread out on the tank, covering the tank, and a pair of boots could be seen in the sleeper compartment. Akins' suspicions were aroused because during the first stop, Akins and his partner had shown a great deal of interest in the propane tank, and it now appeared that someone had gone to substantial trouble to completely conceal the tank from view. Akins then recognized that the driver was the same driver he had stopped three months previously, and decided to stop him again.

Akins testified that the motivating factor for the second stop was information gained during the first stop. This information included the facts that the bottom of the sleeper shell had been cut out to accommodate the propane tank, that during the prior stop Defendant had stated he was on Highway 180 by mistake (but now he was on the same highway again), and that the rubber flap had been used to conceal the propane tank in which the agents had exhibited strong interest during the first stop. Akins also testified on cross-examination that he did not initiate the second stop because of a desire to investigate Defendant's nationality or because of any traffic

violation he might have observed. Instead, he stopped Defendant because he had been suspicious of the propane tank during the first stop and he was in a "better position to get a better inspection of that tank" on the second stop. Before Akins actually stopped Defendant the second time, Akins had already radioed for a dog sniffing team to meet him at the scene.

Once Akins had stopped Defendant the second time, he asked Defendant about Defendant's intended destination. Defendant stated that he was on his way to Springerville, Arizona, which is located on Highway 180, to find a brother he had not seen in a long time. Akins was suspicious of this response, because he wondered why Defendant had not visited his brother when he was in the area three months previously. Akins also asked Defendant where he was born, and again inquired into Defendant's citizenship.[1] After taking Defendant's license back to his own vehicle and calling in the information from the license to the "El Paso sector," Akins returned to Defendant's vehicle and asked Defendant to step out of the truck.

The testimony concerning what happened next was diametrically opposed. Akins testified that he returned Defendant's driver's license and asked Defendant for permission to inspect the bed of the truck, and that Defendant gave that permission. Akins also testified that he then knocked on the propane tank and heard a dull thud rather than the normal sound a knock on such a tank would produce. From this he concluded that the tank likely contained contraband. Finally, he testified that he asked Defendant if Defendant would wait until the canine unit arrived, and Defendant consented to the wait. Defendant, on the other hand, testified that his license was not returned to him, that he did not voluntarily agree to any inspection of his vehicle, and that he was

---

[1] Several hours later Akins determined Defendant is a naturalized American citizen born in Mexico.

told they would have to wait until the dog arrived.

The Court notes that when Akins stopped Defendant, Akins was intent on inspecting the propane tank he had previously found suspicious. The Court also notes that Akins had already radioed for the canine unit as he was making the stop and before he made any inquiry of Defendant. Finally, the Court notes that Defendant, while he does speak English, is an elderly native Spanish speaker who has enough trouble with the language that an interpreter was required to be available in court to assist with any difficulty Defendant might have with English. Based on all of these factors, the Court finds that even though Akins was polite throughout the encounter, the manner and phrasing of his requests were such that Defendant did not understand he had the option of refusing to allow the initial inspection or of refusing to wait for the dog team to arrive. The Court also finds that Akins would not have allowed Defendant to leave before the dog arrived, and that Akins conveyed this fact to Defendant either directly, in the language he used, or implicitly, in the way he stated his "requests." Finally, the Court finds that Akins did not return Defendant's driver's license until after he had obtained Defendant's acquiescence both to the inspection of the truck and to the half-an-hour wait for the dog team. In sum, the Court finds that Defendant did not in fact have the option of refusing to allow either the inspection of his vehicle or the performance of the dog sniff. The Court also finds that Defendant did not "knowingly" consent to either activity.

At some point in the encounter, either before or after Akins inspected the tank and knocked on it, Akins and Defendant moved their vehicles to a nearby rest area so Defendant could use the bathroom. The dog team then arrived at the area, approximately one-half hour after the initial stop, and the dog alerted to the propane tank. At that point Defendant was told to drive his

truck back to Deming, where a search of the tank revealed a compartment containing a sizeable amount of marijuana. Defendant has moved to suppress that marijuana as the product of an unconstitutional stop, search, and seizure.

### Validity of First Stop

The government's evidence and argument at the hearing focused primarily on the second stop and the reasons for that stop. The government argued that the first stop revealed that the tank was suspicious, that the agents had examined the tank for an extensive period of time during the first stop, that Defendant had then taken measures to conceal the suspicious tank, and that even though during the first stop Defendant had claimed he was on Highway 180 by mistake, three months later he was back on the same route, a known smuggling corridor. Defendant, on the other hand, maintained that both the first stop and the second stop were unconstitutional because they were unsupported by reasonable suspicion.

From Agent Akins' testimony it is apparent that the information he obtained during the first stop was the primary reason for the second stop. Under traditional fruit-of-the-poisonous-tree principles, therefore, the Court must decide the validity of the first stop. See U.S. v. Mounts, 35 F.3d 1208, 1213, fn.3 (7th Cir. 1994) (where police obtained information during first stop that formed basis of second stop, the admissibility of the results of the later search depended on the legality of the first stop), cert. denied, 514 U.S. 1020 (1995); see also U.S. v. Hahn, 922 F.2d 243, 245 (5th Cir. 1991) (case involving two searches; court states that if first search was valid, second would be also, as based on probable cause; if first search was invalid, second would fail as well under "fruit of the poisonous tree" doctrine); U.S. v. Hansen, 652 F.2d 1374, 1383 at fn. 7, 1386-87 (10th Cir. 1981) (noting that subsequent search to initial search could be contested under

theory that subsequent search was tainted by prior illegal search and was fruit of the poisonous tree; affirming district court's suppression of evidence obtained in search of second hotel room because evidence obtained in illegal first search pointed to second room as probable location of contraband, and no independent source provided similar information).

Turning to the facts of the first stop, the Court notes that according to Akins' testimony, the only factors supporting that stop were the Illinois license plates on Defendant's truck, the fact that Defendant was traveling on Highway 180, and the fact that a propane tank in the bed of the pickup was located underneath a half-shell sleeper cab and appeared to protrude somewhat into the bottom of the shell.  The Court finds that these circumstances, standing alone, do not give rise to the level of suspicion required to support an investigatory stop.

A roving border patrol stop need not be based on probable cause to believe a crime is being committed.  Instead, such a stop is valid if the agent making the stop is aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicle's occupant may be involved in criminal activity.  Barron-Cabrera, 119 F.3d at 1459.  Factors to be considered in assessing the validity of a stop include the characteristics of the area in which the stop occurs, the proximity of the area to the border, the usual patterns of traffic on the particular road, the agent's previous experience with alien traffic, information about recent illegal border crossings in the area, the driver's behavior, aspects of the vehicle such as the existence of concealed compartments, and the appearance that the vehicle is heavily loaded.  Id. at 1460.  While not all of these factors apply to a drug-smuggling stop such as this one, as opposed to an alien-smuggling stop, they are useful for purposes of comparison.

The only one of these factors clearly met before the first stop was the characteristics-of-

the-area consideration. Highway 180 has been considered a smuggling corridor. Id. at 1462; U.S. v. Leyba, 627 F.2d 1059, 1060 (10th Cir.), cert. denied, 449 U.S. 987 (1980). However, the first stop occurred in Glenwood, New Mexico, which is over 100 air miles from the closest point on the United States-Mexico border.[2] This fact substantially lessens any suspicion that Defendant was en route from the border when he was stopped. See U.S. v. Lopez-Martinez, 25 F.3d 1481, 1485 (10th Cir. 1994) (noting administrative definition of "reasonable distance" for purposes of roving border stops as being 100 air miles from border; declining to adopt such an inflexible benchmark, but noting that the federal regulations are informative). In addition, Defendant was stopped north of Silver City, and Highway 180 also passes through Deming, both of which are communities of over 10,000 in population. This further limits the ability to predict that Defendant had actually come from the border, as well as the basis for the stop. See U.S. v. Venzor-Castillo, 991 F.2d 634, 638-39 (10th Cir. 1993) (fundamental basis for border patrol agents' ability to make stops based on reasonable suspicion rather than probable cause is a reasonable belief that the person entered the United States from outside the country; where a vehicle is found in a location past several towns in this country, the mere fact that the highway eventually leads to the border is not sufficient reason to believe the vehicle also came from the border). Therefore, the proximity-to-the-border factor has not been satisfied in this case.

      The Court finds that the third factor, traffic patterns on the road, was not suspicious at the time of the first stop. Unlike the situation in other cases, Defendant was traveling in broad daylight rather than in the dead of night. Compare Leyba, 627 F.2d at 1063-64 (defendant

---

[2]There was no testimony at the hearing as to the distance from Glenwood to the border, either by highway or by air. However, the Court takes judicial notice of maps of New Mexico that show Glenwood is located more than 100 air miles from the closest point on the border.

traveling at three in the morning, a time of very light traffic).  Although Defendant was driving a vehicle with out-of-state plates, this fact is entitled to little consideration.  The Court takes judicial notice that Glenwood is located in the Gila National Forest and near the Gila Cliff Dwellings, both of which are attractions which may attract out-of-state visitors.  In addition, there was no testimony that Illinois is a favorite destination for drug smugglers crossing the border in New Mexico, or that a number of Illinois-plated vehicles had recently been found to contain contraband.  See U.S. v. Martinez-Cigarroa, 44 F.3d 908, 911 (10th Cir.) (while out-of-state license plates may be a relevant consideration in some circumstances, as a general rule this factor is not significantly probative of illegal activity and adds little to the reasonable suspicion equation), cert. denied, 514 U.S. 1029 (1995).

   Little or no information was provided concerning the next three factors, as well as the last consideration.  For example, Akins did not relate his previous experience apprehending aliens or smugglers to the first stop, and there was no testimony concerning recent illegal border crossings.  In addition, Akins stopped Defendant before he could observe anything about Defendant's driving or other behavior.  Finally, there was no testimony that the vehicle was heavily loaded at the time of the stop.  The Court therefore finds that the stop did not involve any of these factors.

   The aspects-of-the-vehicle factor does merit brief discussion.  Akins testified that he noticed the truck because a half-shell sleeper compartment was attached to the bed on top of the propane tank, and the arrangement seemed a little odd.  The Court finds, however, that Akins could not determine whether the tank actually protruded into the sleeper compartment until he

9

stopped Defendant.[3]  As the government acknowledged, propane-powered pick-ups carrying tanks are not unusual in the area.  Even though such tanks, as well as normal gasoline tanks, may be used for hiding contraband, the mere fact that a pick-up is carrying a propane tank does not add weight to the reasonable-suspicion equation.

The Court is then left with the fact that this particular tank was located underneath a sleeper compartment that covered part of the bed of the truck, leaving the tank visible.  The Court sees nothing suspicious in the fact that a sleeper cab is installed over a propane tank, thus leaving the rest of the truck's bed available for carrying cargo.  If concealment of the tank had been the primary objective, a full camper shell would seem to be much more effective.  Furthermore, it does not seem unusual that a pick-up with sleeping accommodations would be found driving through a national-forest area where camping is readily available.  Since Akins could not see before the stop that the floor of the sleeper shell had been cut out to accommodate the top of the tank, a much more unusual arrangement, the Court finds that the location of the tank did not give rise to a reasonable suspicion that Defendant was carrying contraband.  Akins himself admitted this in his testimony, stating only that he found the arrangement a little odd, and that his suspicion before the stop that Defendant might be doing something illegal was not "real strong."

The foregoing discussion may be summarized as follows.  Defendant was stopped over 100 air miles from the border, north of two sizeable New Mexico communities, by an agent who had no idea whether Defendant was coming from the border, from Arizona, from the Gila Cliff Dwellings, or from a different location.  The only bases for the stop were Defendant's Illinois

---

[3]At this time Akins also realized the camper shell would have to be moved to refill the propane tank.

license plates, the fact that the highway is a known smuggling corridor, and the fact that Defendant's truck carried a propane tank over which a half-shell sleeper compartment had been installed. The Illinois license plates are entitled to no weight due to the proximity of the stop to outdoor recreation sites that are attractive to out-of-state as well as in-state citizens. The Court declines to find that any driver of a vehicle carrying a Midwestern license plate, driving fairly far from the border, may be reasonably suspected of illegal activity simply because there is something unusual, although not immediately suspicious, about the vehicle. This is so even if the vehicle is traveling on a highway that is frequented by cross-border smugglers, as is the highway in this case.

### Validity of Second Stop

The Court finds, based on Akins' testimony, that the second stop was inextricably intertwined with the first. As noted above, Akins made the second stop because the information gained in the first stop had made him highly suspicious of the propane tank, and he wanted an opportunity to get a better inspection of the tank. Although Akins did not specifically say so, it is apparent that what he wanted was an opportunity to give a drug-sniffing dog access to the vehicle, since he had already inspected the tank thoroughly during the first stop and had determined that it did contain propane and was hooked up properly to the engine. Making Akins even more suspicious was the fact that during the first stop, Defendant had stated he was on Highway 180 by mistake, yet here he was again on that same highway. Finally, knowing from the first stop that the bottom of the sleeper compartment had been cut out and that Defendant had now concealed the tank behind a rubber flap and under a sleeping bag, Akins' suspicions were further aroused. All of the factors leading to the stop–the motivation for the stop as well as the

suspicions providing justification for the stop–were based on facts that must be suppressed, because they were the products of the first unconstitutional stop of Defendant's vehicle.[4]

The Court finds that the second stop would not have occurred except for the information gained during the first stop, which the Court has found was unconstitutional. This finding requires that the evidence obtained during the second stop be suppressed, as fruit of the poisonous tree. See Mounts, supra; Hahn, supra; Hansen, supra.[5]

**Validity of Consent**

In some situations a valid, voluntary consent to a search can dissipate the taint of earlier unconstitutional action by the authorities. If the consent is given after an illegal stop, however, the government carries a heavy burden of showing that the primary taint of the illegal stop was purged and the subsequent consent was voluntary in fact. U.S. v. Gregory, 79 F.3d 973, 979

---

[4] Although Akins did testify that before the second stop Defendant's truck strayed over the right-hand edge of the lane two times, he did not testify that his reason for making the stop was a traffic infraction. Instead, he stopped Defendant to investigate the suspicious propane tank. Therefore, the possible traffic violation need not be considered as a basis for the stop and the Court will not attempt to determine whether such a violation occurred. See U.S. v. Toro-Pelaez, 107 F.3d 819, 824 (10th Cir.) (where traffic violation is not asserted as basis for stop, stop comports with Fourth Amendment only if it is based on reasonable suspicion), cert. denied, 118 S.Ct. 129 (1997).

[5] The government has not argued, either in its brief or at the hearing, that the second stop may be justified by information obtained independent of the first stop, and that this independent information provided reasonable suspicion to stop Defendant. The Court therefore does not address that possible argument. The Court notes, however, that given Akins' testimony, it is virtually impossible to excise the information gained in the first stop from the second stop. There was no testimony that indicated Akins would have even remembered seeing Defendant's vehicle three months before if he had not stopped Defendant the first time. Based on the pictures shown to the Court at the hearing and on Akins' testimony, it is doubtful whether Akins or any other agent would have known there was a propane tank behind the rubber flap and under the sleeping bag, if Akins had not remembered stopping the same truck before and being suspicious of the propane tank.

(10th Cir. 1996).  As the Court has found above, in this case Defendant did not knowingly consent to either Akins' inspection of the propane tank or the half-hour detention while the dog team was en route to the rest area.  Having failed to prove that any valid consent was obtained in this case, the government cannot establish that the taint of the unconstitutional stops was purged.  The Court therefore finds that the dog sniff cannot be justified on the basis of any purported consent given by Defendant.

> **Conclusion**

Having found that there was no reasonable suspicion for the first stop of Defendant's vehicle, and that the information gained during that stop led inexorably to the second stop, the Court holds that both stops violated Defendant's rights under the Fourth Amendment.  The Court further holds that the taint of these illegal stops was not purged by any subsequent consent.  Therefore, the Court will suppress all evidence obtained as a result of the first or second stop, including the contraband discovered as a result of the second stop.

> DATED January 15, 1998.

_____
BRUCE D. BLACK
UNITED STATES DISTRICT JUDGE